**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

ALEX SHTEYNSHLYUGER, M.D.,

          Plaintiff,

          v.

CENTERS FOR MEDICARE AND
MEDICAID SERVICES, and

U.S. DEPARTMENT OF HEALTH AND
HUMAN SERVICES,

          Defendants.

Civil Action No. 20-02982 (RDM)

**SECOND DECLARATION OF HUGH GILMORE**

I, Hugh Gilmore, declare as follows:

      1.      I am the Director, Freedom of Information/Privacy Acts Division, Centers for

Medicare and Medicaid Services, an entity of the U.S. Department of Health and Human

Services ("CMS"). In this capacity, I am the Freedom of Information Officer for CMS. I have

held this position with CMS since June of 2014.

      2.      My duties include responding to requests under the Freedom of Information

Act, 5 U.S.C. § 522 ("FOIA"), for CMS documents. My duties further include managing

searches for CMS documents in response to requests under the FOIA, and determining

whether to release or withhold documents or portions of CMS documents in accordance with

the FOIA and the CMS regulations implementing the FOIA.

      3.      This declaration is my second Declaration in this case. It incorporates and

supplements my first Declaration dated December 18, 2022 (ECF No. 28-3). I submit this

second Declaration to address the Department's response to certain statements Plaintiff makes in

Plaintiff's Memorandum In Support of His Cross-Motion For Summary Judgment and

Opposition to Defendants' Motion For Summary Judgment ("Plaintiff's Response") (ECF No.

32).  More specifically, this second Declaration seeks to explain how the Department assessed

the foreseeable harm that would result if the records at issue in this case and mentioned in

Paragraphs 42, 98, and 118 of my first Declaration were disclosed, and to explain why the

Department consequently decided to withhold these records from disclosure pursuant to

Exemption 5 of 5 U.S.C. §552(b).

4.        I make this second Declaration based upon my personal knowledge and

information available to me in my official capacity.  I have reviewed the documents at issue in

the above-captioned litigation, as well as the *Vaughn* index describing withheld information that

is at issue.

5.        Starting with the records at issue in this case which are mentioned in

Paragraph 42 of my first Declaration, as I explained in Paragraph 42 of my first Declaration,

CMS invoked Exemption 5 for records that related to communications from CMS personnel

to CMS OSORA executive correspondence staff regarding correspondence from the

American College of Gastroenterology ("ACG").  *See* ECF 28-3, at ¶ 42.  These

communications were internal to CMS.  The purpose of these internal exchanges was to

discuss the concerns that CMS had regarding CMS providing hurricane relief to ACG.

6.        To better understand the foreseeable harm, the background was that in

response to Hurricane Michael, then Department Secretary, Alex Azar, acted under his

authority under the Public Health Service Act to declare a public health emergency (PHE)

in Florida on October 9, 2018, and in Georgia on October 11, 2018.  The Public Health

Service Act was the underlying authority that enabled him to enact such PHE flexibilities to

support CMS beneficiaries.  https://www.cms.gov/newsroom/press-releases/cms-acts-help-

hurricane-michael-emergency-response.  With the PHE in effect, CMS took several actions

to provide immediate relief to those impacted by Hurricane Michael.  Id.  The actions

included temporarily waiving or modifying certain Medicare, Medicaid, and Children's

Health Insurance Program (CHIP) requirements; creating special enrollment opportunities

for individuals to access healthcare immediately; and taking steps to ensure dialysis patients

obtain critical life-saving services.  Id.  The goal was to facilitate prioritizing the aid to

communities in recovery and affording opportunity for a complete recuperation from the

devastation of the hurricane.  Id.  The reason was that Hurricane Michael had highlighted

the importance of granting providers increased flexibilities when working to meet the

emergency health needs of patients under challenging and demanding conditions.  Id.

       7.      As attached **Exhibit A** shows, ACG was aware that CMS had not enacted a

policy of granting temporary exceptions during the Hurricane Michael emergencies as they

relate to the Merit-based Incentive Payment System (MIPS) under the Quality Payment

Program (QPP), and ACG was supportive of CMS enacting such a policy.  See **Exhibit A**

attached to this Declaration.  Such temporary exceptions if they had been enacted, would

have related to not having to comply with certain reporting requirements that MIPS-eligible

entities normally have to comply with outside of natural disasters.  As a result, ACG (as a

special interest group) reached out to then CMS Administrator Seema Verma on behalf of

the MIPS-eligible clinicians to urge her to announce additional exceptions in the form of

broad waivers for MIPS-eligible clinicians in communities impacted by Hurricane Michael

for calendar year 2018.  Id.  To the best of my understanding, CMS had to use the federal

rulemaking process for the hurricane relief waiver that ACG was requesting for the MIPS-eligible clinicians, to create an additional specific emergency policy exception for this category of clinicians, which entailed publishing in the Federal Register. To the best of my knowledge, it is my further understanding that the emergency hurricane waiver related to the MIPS-eligible clinicians was granted through the rulemaking process for certain geographical areas in Florida and Georgia.

8.    CMS released to Plaintiff emails related to the correspondence that CMS had with ACG, regarding ACG's request of the emergency hurricane relief waiver for the MIPS-eligible clinicians. The information that Plaintiff seeks relates to CMS' own internal electronic correspondence regarding the CMS reasons and context that are tied to ACG requesting this hurricane relief waiver for the MIPS-eligible clinicians.

9.    Disclosure of this information would cause foreseeable harm to CMS on several fronts. First, obtaining this internal correspondence would show the internal decisional process that CMS follows to consider the hurricane relief waivers for MIPS-eligible clinicians. In other words, when it comes to waivers for MIPS-eligible clinicians in communities impacted by Hurricane Michael for calendar year 2018, releasing the contents of this internal correspondence would show how CMS makes choices, the criteria CMS uses to determine hardship, how CMS gathers information on the MIPS-eligible clinicians' need to benefit from an emergency waiver, CMS' inquiry into the justification that is provided to CMS by the MIPS-eligible clinicians affected by the hurricane, or their representatives, how CMS assesses alternative resolutions to emergency relief, and how CMS assesses compliance with these criteria. The problem with releasing this information is that if any entity dealing with MIPS-eligible clinicians' interests later applies for waivers in

communities impacted by hurricanes, such entity would have a roadmap and would know exactly what it needs to do to obtain a hurricane emergency waiver, or manipulate the information provided to CMS to bypass certain checks and balances regarding the legitimacy of a request for a hurricane waiver.  For example, an entity may seek to be exempted from regulatory compliance and use the hurricane emergency waiver as an excuse to obviate this compliance, or to not have to comply with certain reporting requirements. This could lead to abuse.

10.      Second, the release of this internal correspondence would create issues that will be explained in the next sentence, because it would identify the CMS employees in the program office who are involved in administering the emergency hurricane relief waiver for MIPS-eligible clinicians; who internally at CMS is involved and at what stage; and at what level of administering of the MIPS-eligible clinicians emergency hurricane relief waiver, to name just a few issues.  While at first glance the release of this information may appear to be innocuous and foster transparency, the problem with publicizing this information is that as will be detailed below it somewhat indirectly provides a way to bypass the authority that is granted to the Secretary of Health and Human Services under the Public Health Service Act to declare a public health emergency, and to obtain a waiver from the CMS Administrator.  To explain further, given that the PHE authority provided under the Public Health Service Act is very exceptional, as ACG initially did as shown by **Exhibit A**, any waiver under the PHE and hurricane relief should be routed via the CMS Administrator and his or her designees.  Given the exceptionality of the situation, this central routing would allow for internal coordination, internal order (meaning lack of anarchy), quality control, executive accountability, and organizational development, to name just a few factors.  This

internal coordination of external requests for emergency hurricane waivers routed through

the Secretary of Health (or CMS Administrator, his designee) is especially important in the

context of a natural disaster like a hurricane, where it is not business as usual, and where

notwithstanding that the CMS staff is dealing with an emergency enactment with which the

CMS staff is not familiar, the CMS staff is also overworked, exhausted, may not have the

usual distance to be able to reflect and discern, and everything has to move fast.

        11.      If this centralization through the CMS Administrator is not followed, after

ACG has sent its request for hurricane relief to the CMS Administrator, any legal

representative (like a law firm) of ACG, or any similarly situated entity who is in possession

of the released contact and name information of the CMS staff who was involved in this

exceptional waiver process, would use these names as an indirect lobbying mechanism to

exercise pressure on this staff to obtain a waiver within the context of hurricane relief.  Here

is how this would work.  The legal representative of ACG would send a correspondence to a

CMS employee whose name was one of those who were released in these emails to follow-

up with that employee on the status of the original ACG request for hurricane relief.  Unlike

the original correspondence that ACG would have sent to the CMS Administrator to request

an emergency waiver for MIPS-eligible clinicians related to hurricane relief to not have to

comply with certain reporting requirements, the follow-up correspondence to the CMS staff

would not be sent to the CMS Administrator.  The correspondence (even as an email) sent

by the legal representative would have the signature (or signature block) of the law firm.

Notwithstanding the fact that receiving this type of unexpected email would abnormally

augment the inbox of the CMS employee, the simple receipt of an email from a legal

representative would be intimidating for the employee (as it would for any employee, or

6

anyone for that matter).  Even if the waiver request were diplomatically couched as a

follow-up request, the fact that it came from a legal representative or law firm, would

suggest in the psyche of the employee a sense of threat, that this was more of a demand than

a request for follow-up.  As anyone knows, any correspondence from a legal representative

often entails a fear of litigation and of appearing before a court.  Due to the emergency of

the natural disaster situation being coupled with the fear of facing a court, the CMS

employee would lose their sense of independence.  At this stage, having a foot in the door,

the legal representative would be able to exert even more influence on the employee and

pressure that employee to agree to do something, or not do something that would favor the

waiver requestor, hence putting CMS in a binding situation.

       12.     Another variation of this scenario would be that in looking at these emails,

the legal representative would now be in a position to identify a CMS employee whose

perspective is the most in alignment with the position of Plaintiff or someone similarly

situated.  Armed with this information, a legal representative, any entity connected to a

person who is similarly situated to Plaintiff, or someone with a certain degree of authority

would email that CMS employee and ask them questions that force the employee to

inadvertently put CMS in a difficult position, or lead them to influence the CMS employee.

They could for example state "we need your assistance with hurricane relief, can you help,"

or "we would like to do such and such, could we do that," to try to get from that employee

an interpretation that would be more beneficial to them than the official guidance coming

from the CMS Administrator.  The outsider who is requesting the waiver could also for

example say "when it comes to waiver of reporting for hurricane relief, can we reword this

language in our request in this manner?"  Having direct access to a CMS employee who

participates in the decision-making process of waivers in the context of hurricane relief, would constitute a boon.  The outsider who is requesting the waiver would also be in a position to give the CMS employee reasons as to why they would like to see certain language more broadly applied or interpreted to cover their unique situation.  The outsider who is requesting the waiver would thereby get a chance to be heard directly by someone who is in a position to influence the internal decision-making process.  This would constitute a form of unauthorized, informal, individualized rulemaking.  Not only would this accessing of the CMS employee influence the internal CMS process, but it would also provide an unfair advantage that other members of the public who do or did not have access to this information would not have in influencing the decision-making process of CMS.

13.    Regarding the withholdings described in Paragraphs 92 and 118 of my first Declaration, they all concern draft information related to sub-regulatory guidance, EFT/FAQs, a draft memo on EFT revision, and drafts of responses to Plaintiff.  *See* ECF 28-3, at ¶¶ 92, 118.  As a result, I will address the foreseeable harm related to these two paragraphs together below.

14.    To better understand the foreseeable harm, the background is that Plaintiff has filed over 99 administrative complaints with CMS related to the Administrative Simplification Process (ASP).  The ASP is a process that facilitates electronic funds transfers between health care insurance and providers like Plaintiff.  To the best of my knowledge, most of Plaintiff's 99 administrative complaints to CMS relate to the electronic funds transfer (EFT) process by which providers like Plaintiff have to pay transactional fees to third parties, clearing houses.  It is my understanding that Plaintiff has in some form or another sought to challenge the levying of such EFT fees.  Starting with the sub-regulatory

guidance, this guidance was about clarifying the EFT processing and resulting fees that could be assessed.  If this guidance is released, Plaintiff would be able to see old versions of the guidance, compare them with the new versions, and see two different language definitions.  The foreseeable harm would be that the meanings of the wording used in the different versions could be subject to different interpretations.  If Plaintiff or someone similarly situated gets the draft versions, they would have access to the comments and redlines which in turn would shed light on why CMS is stating a position that Plaintiff may be opposed to, or why CMS should contemplate a position Plaintiff may desire.  Plaintiff or someone similarly situated would also be able to see the names of CMS staff, who is doing the edits, or how each particular CMS employee feels about a certain position that CMS is taking.  In the same vein as is the case for the waiver for the MIPS-eligible entities, with this information, Plaintiff or someone similarly situated would then be in a position to identify a CMS employee whose perspective is closely aligned to theirs and who could indirectly be their champion inside CMS to achieve what they would like to see happen in a CMS policy related to EFTs.  Plaintiff or someone similarly situated would then follow that person and contact them to get them to adopt or commit to the favorable interpretation that suits them.  This would encourage disordinate outside interference in the Department.  It would therefore also affect the Department's deliberative process.

15.     The withholdings described in Paragraphs 92 and 118 of my first Declaration also related to the EFT/FAQs which are connected to the sub-regulatory guidance that as stated above, seeks to clarify the EFT process and its resulting fees.  In this regard, there were emails that discussed the past EFT/FAQs, modified the current FAQs, discussed whether to discontinue the FAQs or a particular FAQs, discussed wording changes,

discussed justifications for the changes, discussed why CMS was not going in a particular

direction with the EFT/FAQs, or suggested that something may have been too broadly

described, and needed to be more narrowly described.  If Plaintiff or someone similarly

situated obtained this information, this person would be in a position to use the deliberative

information to claim that there was an internal stifling of opinion to change certain

procedures related to EFT fees.  This would provide support for the proposition that the

change of wording in EFT/FAQs is something that should be disagreed with because the

original language was better.  Armed with this information, Plaintiff or someone similarly

situated would be in a position to either rally more outer support from others outside CMS

who are similarly situated for their perspective, or would go to the CMS staff who made the

comments and appeared to be more aligned with Plaintiff's perspective to try to elicit from

the staff interpretations and changes more favorable to Plaintiff's ultimate goal, which is to

remove the EFT fees.  My statements are  derived from the high number of ASP complaints

filed by Plaintiff against CMS, which all in one form or another relate to EFT fees and to

the clearing houses who act as facilitators for the electronic payments from health care

insurances to providers like Plaintiff.  The sheer number of ASP complaints filed with CMS

on the theme of EFT fees suggests that Plaintiff seeks to eradicate fees to providers

regarding EFT transactions.

      16.     The withholdings described in Paragraphs 92 and 118 of my first Declaration

also related to draft memos.  These draft memos are connected the EFT/FAQs.  The

foreseeable harm in releasing this information is similar to the harms that I described in the

prior Paragraphs 15-16.  Among others, Plaintiff or someone similarly situated would have

access to the variations in draft wording that were used, would pick the variation of the

wording they prefer as it relates to EFT and would use this to re-frame the issues related to

EFT in a manner that mis-characterizes these issues and creates confusion. To explain

further, in order to provide EFT services to providers like Plaintiff, clearing houses

sometimes require some form of subscription. As I indicated, the ASP is a process that

facilitates electronic funds transfers between health care insurance and providers like

Plaintiff. ASP requires that a provider like Plaintiff be covered by HIPAA (Health

Insurance Portability and Accountability Act). The subscription that clearing houses require

to provide EFT services involves a private contractual arrangement between the clearing

house and a provider like Plaintiff, that entails a fee, which is a contract over which CMS

has no control. If the draft memos were released, given Plaintiff's record of persistently

filing administrative EFT related complaints with CMS, Plaintiff would use these draft

memos to mis-characterize and create confusion. My statements are further supported by

the fact that when it comes to Plaintiff's 99 complaints against CMS, Plaintiff consistently

refuses to accept CMS' conclusions regarding these complaints. For example, Plaintiff

refused to accept that that a particular entity that Plaintiff is doing business with (like Blue

Cross Blue Shield Association conglomerate which itself is a conglomerate and not a health

care plan like Blue Cross Blue Shield of Massachusetts) is not covered by HIPAA and

hence, would not be covered by the EFT provisions of the ASP. In other words, Plaintiff

refused to accept that if an entity is not covered under HIPAA, CMS would not have any

authority over that entity because the ASP rules would not apply. It is for all of the above

reasons that I state that in obtaining information on the draft Memos, Plaintiff would use

this information to identify and find internal CMS sympathizers to his cause of removing

EFT fees. As was the case for the internal communications related to the waiver for

hurricane relief, accessing these internal sympathizers would add confusion, create

disharmony with inaccurate information, and would constitute a form of unauthorized,

informal, individualized rulemaking in favor of providers like Plaintiff, at the unfair

disadvantage of the clearing houses.  This would expose CMS to lawsuits from the clearing

houses, from providers who are receiving misinformation and confused because they are

charged by clearing houses, among a host of other issues.

17.     Finally, the withholdings described in Paragraphs 92 and 118 of my first

Declaration also related to draft responses to Plaintiff.  These drafts responses represent CMS'

responses to some of Plaintiff's administrative complaints on the EFT transactions and fees.

Here, Plaintiff was asking for copies of the draft FAQs, to see the old versions and any changes,

and a white paper and Memo.  In an administrative complaint that Plaintiff filed with CMS on

ASP on May 7, 2020, Plaintiff has portrayed himself as an "advocate for administrative

simplification and healthcare" and stated that he is offering his assistance on these issues.  See

**Exhibit B** attached to this Declaration, at 2.  Releasing information related to the changes in the

language in the draft responses would enable Plaintiff to engage in speculation, conjecture or

misinterpretation of why the wording was changed.  More specifically, somewhat similar to the

issues raised in the prior paragraph on the release of the draft memos, Plaintiff would try to

exploit which words were changed, why, the meaning of which words, how the differences had

an impact on Plaintiff's situation and on the EFT fees that providers like him are asked to

disburse.  As an "advocate for administrative simplification and healthcare," Plaintiff would use

this information to frivolously sue CMS, claiming that CMS was not fulfilling its ASP

enforcement duties against entities like health care plans and clearing houses who are involved

in the EFT process, when in fact CMS does not have enforcement authority over these entities

when it comes to the EFT process because the EFT process is a contractual process between

these entities and providers like Plaintiff.  Stated differently, based on the administrative

complaints that Plaintiff filed against CMS which all relate in one form or another to the EFT

process, its administration, and the authority of CMS, among others, Plaintiff's position would

be that under ASP regulations, no EFT fees can be allowed against health care providers like

him.  Plaintiff's argument would be frivolous because in fact, contrary to Plaintiff's assertions,

the ASP regulations 45 C.F.R. §162.925(a)(5) only state that excessive EFT fees are not

allowed.  They do not state that no EFT fees can be allowed against providers like Plaintiff.

Based on the arguments that Plaintiff puts forth in his administrative complaints against CMS

that he was being charged for EFT fees, based also on the fact that Plaintiff submitted

paperwork showing the fees that he paid in the EFT transactions, and based further on the fact

that Plaintiff demanded that CMS put a stop to the assessment of the EFT fees, I state that

Plaintiff would also sue CMS on the grounds that non- HIPAA covered entities like some

clearing houses that levy EFT fees against Plaintiff, have no right to assess EFT transaction fees

on providers like him.  This argument too would be frivolous because non-HIPAA fees are

levied based on contractual relationships between the non-HIPAA entity and the provider.  I

further state that as an alternative or in addition, equipped with this information, Plaintiff would

use this information to get other providers who sympathize with his cause to join a class action

suit against CMS.

18.    In summary, CMS avers that it only withheld information that would cause

foreseeable harm under Exemption 5.                          _

Executed this 21st day of April, 2023.

13

_____
Hugh Gilmore