UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ALEX SHTEYNSHLYUGER,<br><br>*Plaintiff*,<br><br>v.<br><br>CENTERS FOR MEDICARE AND MEDICAID SERVICES, *et al.*,<br><br>*Defendants*. | Civil Action No. 20-2982 (RDM) |

**DEFENDANTS' OPPOSITION TO PLAINTIFF'S CROSS-MOTION
FOR SUMMARY JUDGMENT AND REPLY MEMORANDUM OF LAW
IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Defendants, the Centers for Medicare and Medicaid Services ("CMS") and U.S. Department of Health and Human Services, respectfully submits this Opposition to Plaintiff's Cross-Motion for Summary Judgment ("Pl.'s Mot."), ECF Nos. 31, 32, and Reply in Support of Defendant's Motion for Summary Judgment, ECF Nos. 28.

## ARGUMENT

Plaintiff argues that CMS failed to conduct an adequate search for potentially responsive records, Pl.'s Mot. at 18-26, and challenges three categories of redactions, *id.* at 7-18. None of Plaintiff's arguments are meritorious.

**I.   CMS CONDUCTED AN ADEQUATE SEARCH FOR THE REQUESTED RECORDS, USING PLAINTIFF'S TERMS, IN LOCATIONS REASONABLY EXPECTED TO CONTAIN RESPONSIVE DOCUMENTS, AND USING METHODS WHICH WERE REASONABLY EXPECTED TO PRODUCE THE INFORMATION REQUESTED.**

As to the search, as explained in the Declaration of Hugh Gilmore, ECF No. 28-3 ("Gilmore Decl."), and in the Defendant's Memorandum, ECF No. 28-1, CMS's search efforts included (1) an assessment of the types of records that Plaintiff requested, *See* Gilmore Decl.¶ 19;

(2) searches of the records systems that were likely to turn up the information that Plaintiff requested, Gilmore Decl. ¶¶ 8, 11, 19, 21, 25, 67, 70-71, 76; and (3) those searches used search terms and keywords supplied by Plaintiff in his requests, Gilmore Decl. ¶¶ 23, 35, 53, 60-, 66-71, 86, 98, 109; ECF No. 28-7 (April 13 Request); ECF No. 28-10 (May 4 Request); ECF No. 28-12 (May 6 Request); ECF No. 28-15 (May 7 Request); ECF No. 28-17 (May 12 Request);  ECF No. 28-19 (May 15 Request); ECF No. 28-22 (July 22 Request); ECF No. 28-25 (July 29 Request). As explained below, CMS conducted adequate searches for the requested records, using methods which were reasonably expected to produce the information requested.

In general, the adequacy of a search "is judged by a standard of reasonableness and depends, not surprisingly, upon the facts of each case." *Weisberg v. Dep't of Just.*, 745 F.2d 1476, 1485 (D.C. Cir. 1984). "The agency has the initial burden to demonstrate the adequacy of its search, which it may meet by providing declarations or affidavits that are 'relatively detailed[,]. . . nonconclusory and submitted in good faith.'" *Landmark Legal Found. v. EPA*, 959 F. Supp. 2d 175, 181 (D.D.C. 2013) (Lamberth, J.) (internal quotation marks omitted). When a plaintiff challenges the adequacy of an agency's search for records responsive to a FOIA request, the court applies a reasonableness test, and it may grant summary judgment to the agency based on information provided in "[a] reasonably detailed affidavit, setting forth the search terms and the type of search performed, and averring that all files likely to contain responsive materials (if such records exist) were searched." *Valencia-Lucena v. U.S. Coast Guard,* 180 F.3d 321, 326 (D.C. Cir. 1999) (citation omitted). Such agency affidavits attesting to a reasonable search "are afforded a presumption of good faith," and "can be rebutted only 'with evidence that the agency's search was not made in good faith.'" *Defs. of Wildlife v. Dep't of Interior*, 314 F. Supp. 2d 1, 8 (D.D.C. 2004) (quoting *Trans. Union LLC v. FTC*, 141 F. Supp. 2d 62, 69 (D.D.C. 2001)); *Hunton & Williams*

*LLP v. EPA,* 248 F. Supp. 3d 220, 236 (D.D.C. 2017) (Contreras, J.) (citing *Morley v. CIA*, 508 F.3d 1108, 1116 (D.C. Cir. 2007)) ("Once the agency has provided a reasonably detailed affidavit describing its search, the burden shifts to the FOIA requester to produce 'countervailing evidence' suggesting that a genuine dispute of material fact exists as to the adequacy of the search.").

As set forth in Defendant's opening memorandum (at 6-9), the detailed Gilmore Declaration sets forth the search terms, as well as the type of searches performed and locations searched, demonstrating that CMS "made a 'good faith effort to conduct a search . . . using methods which can be reasonably expected to produce the information requested.'" *DiBacco v. U.S. Army*, 795 F.3d 178, 188 (D.C. Cir. 2015).

Contrary to Plaintiff's assertion that CMS should have used other unspecified keywords, *see* Pl.'s Mot. at 4, 18-20, CMS used the terms and keywords supplied by Plaintiff. "In general, a FOIA petitioner cannot dictate the search terms for his or her FOIA request." *Bigwood v. Dep't of Def.,* 132 F. Supp. 3d 124, 140 (D.D.C. 2015) (Ketanji Brown Jackson, J.). The agency retains "discretion in crafting a list of search terms that they believe[ ] to be reasonably tailored to uncover documents responsive to the FOIA request." *Agility Pub. Warehousing Co. K.S.C. v. NSA*, 113 F. Supp. 3d 313, 339 (D.D.C. 2015) (Howell, C.J.) (internal quotation marks omitted). Thus, Plaintiff's argument that CMS should have used different or additional search terms should not prevail. "Where the agency's search terms are reasonable, the Court will not second guess the agency regarding whether other search terms might have been superior." *Liberation Newspaper v. Dep't of State*, 80 F. Supp. 3d 137, 146–47 (D.D.C. 2015) (Howell, C.J.). "[I]t is the agency's burden to show 'beyond material doubt that its search was reasonably calculated to uncover all relevant documents.'" *Gov't Accountability Project v. Dep't of Homeland Sec.*, 335 F. Supp. 3d 7,

11 (D.D.C. 2018) (quoting *Ancient Coin Collectors Guild v. Dep't of State*, 641 F.3d 504, 514 (D.C. Cir. 2011)).

Each of Plaintiff's requests was assessed for the types of records that Plaintiff requested. *See* Gilmore Decl. ¶ 19. Based on that assessment for each request, CMS searched the records systems that were likely to turn up the information that Plaintiff requested. *Id.* Specifically, records relating to the Administrative Simplification process were searched for in their custodian's record system (the National Standards Group (or "NSG") is the custodian of records which are stored in the Administrative Simplification Enforcement and Testing Tool ("Testing Tool" or "ASETT") system. *See* Gilmore Decl. ¶ 21. The Testing Tool web-based application was used for the search because it allows all Health Insurance Portability and Accountability Act ("HIPAA") related transactions to be checked consistently for compliance, syntax, and business rules, so that these transactions can be validated across various formats by validating the code values against clinical and non-clinical code sets or procedure code sets. *Id.*

Further, CMS's correspondence falls was searched for within the Office of Strategic Operations and Regulatory Affairs ("Regulatory Affairs Office"). *See* Gilmore Decl. ¶ 8. The Regulatory Affairs Office used the Strategic Work Information Folder Transfer System (or "SWIFT") database. *See* Gilmore Decl. ¶ 25. That database contains copies of incoming correspondence to the CMS Administrator and leadership. *Id.* Information on complaint allegations, information gathered during the complaint's investigation, findings, and results of the investigation, and correspondence related to the investigation is contained within the HIPAA System (or "HITS"). *See* Gilmore Decl. ¶ 76. The HIPAA System is a single, central, electronic repository of all complaints' documents and information including related investigative files, correspondence, and administrative records. *Id*. The collected information contains name,

address, telephone number, health insurance claim number, geographic location, and background information which relate to the Medicare or Medicaid issues of the complainant. *Id*. The HIPAA System also includes the business information of the respondent to a complaint, that is, the entity or person against whom the complaint is directed, usually a company. *Id*.

The information about the companies and law firms is located in CMS Regional Office 2. *See* Gilmore Decl. ¶ 67. That office handles correspondence related to the New York region and uses the Automated Survey Processing Environment Network (or "ASPEN"), which contains information on survey and certifications of Medicare providers. *Id.* Information about laboratories, nursing homes, and other facilities, is contained in the Centers for Clinical Standards and Quality (or "CCSQ"). *See* Gilmore Decl. ¶ 70. Those Centers used Automated Survey Processing Environment Network as well. *Id.*

Congressional correspondence for the CMS Administrator is located within the Office of Legislation. *See* Gilmore Decl. ¶ 11. It used the Outlook email system.

Thus, because CMS used the terms provided by Plaintiff and searched the locations most likely to contain the responsive documents, the Court should find that CMS "made a 'good faith effort to conduct a search . . . using methods which can be reasonably expected to produce the information requested.'" *DiBacco,* 795 F.3d at 188. Accordingly, the Court should grant summary judgment in Defendants' favor. Because it sets forth "the search terms and the type of search performed, and averring that all files likely to contain responsive materials (if such records exist)," *Shapiro v. Dep't of Just.*, 40 F.4th 609, 612-13 (D.C. Cir. 2022), Mr. Gilmore's Declaration establishes that CMS "made a good faith effort to conduct a search for the requested records, using methods which can be reasonably expected to produce the information requested." *Id.*; *see also Machado Amadis v. Dep't of State,* 971 F.3d 364, 368 (D.C. Cir. 2020) (an agency "must show

that it 'conducted a search reasonably calculated to uncover all relevant documents.'"). Reasonableness, not perfection, constitutes the Court's guiding principle in determining the adequacy of a FOIA search. S*ee Campbell v. Dep't of Just.*, 164 F.3d 20, 27 (D.C. Cir. 1998); *Riccardi v. Dep't of Just.*, 32 F. Supp. 3d 59, 63 (D.D.C. 2014). CMS made a good faith effort to conduct a search for the requested records, using methods which were reasonably expected to produce the information requested, and the Court should so find.

## II.   CMS PROPERLY INVOKED EXEMPTION 4.

Plaintiff argues that CMS misapplied Exemption 4. Pl.'s Mot. 7-12. Here, CMS applied Exemption 4 only to information that was supplied by individuals in complaints they had filed on behalf of their employer (which are not the Plaintiff) or to information that related to a respondent company's exchanges with CMS about that complaint. *See* Gilmore Decl. ¶ 77. These records consisted of the complaint, CMS email exchanges with the complainant, the respondent company's email to CMS about the complaint and any proposed resolution by the respondent company to CMS. *Id.*

The information is commercial or financial because the complaint dealt with electronic funds transfer which relate to financial transactions. *Id.* The information was obtained from a business entity because it was provided by entities like electronic funds clearinghouses, who are generally known to be business entities. *Id*. The information was privileged or confidential because the respondent company was replying to CMS about the complaint through a secure web site at CMS. *Id.* The information was also customarily, and actually, treated as private by its owners because it is restricted with PIN access in a system of records which contains restrictions on public access. *Id.*

Thus, because CMS established that the withheld information was (1) "commercial or financial:" (2) "obtained from a person;" and (3) "privileged or confidential," *Citizens for Resp. &*

*Ethics in Wash. ("CREW") v. Dep't of Just.,* 58 F. 4th 1255, 1262 (D.C. Cir. 2023) (quoting *Pub. Citizen Health Rsch. Grp. v. FDA*, 704 F.2d 1280, 1290 (D.C. Cir. 1983)), Defendants have met their burden and appropriately withheld this information in full pursuant to Exemption 4.

### III.   CMS PROPERLY INVOKED EXEMPTION 5.

Plaintiff challenges the application of Exemption 5, asserting that Defendants have not met their burden of establishing foreseeable harm. *See* Pl.'s Mot. 15-16.

Here, CMS invoked the deliberative process privilege, and redacted material consisting of pre-decisional, deliberative draft document among CMS officials to protect pre-decisional, deliberative communications. The records are: (1) communications from CMS personnel to CMS Regulatory Affairs Office executive correspondence staff regarding correspondence from the American College of Gastroenterology. *See* Gilmore Decl. ¶ 42; *see also* 2d Gilmore Decl. ¶¶ 5-12; and (2) draft information related to sub-regulatory guidance, electronic funds transfer frequently asked questions, a draft memo on electronic funds transfer revision, and drafts of responses to Plaintiff. *See* Gilmore Decl. ¶¶ 92, 118; 2d Gilmore Decl. ¶¶ 13-17. As set forth in the Second Gilmore Declaration, release of the information would cause foreseeable harm.

Specifically, the purpose of these internal communications from CMS personnel to CMS Regulatory Affairs Office executive correspondence staff about correspondence from the American College of Gastroenterology was to discuss the concerns that CMS had about providing hurricane relief to the entity. *See* 2d Gilmore Decl. ¶ 5. CMS had not enacted a policy of granting temporary exceptions during such emergencies as they relate to the Merit-based Incentive Payment System under the Quality Payment Program. *Id*. ¶ 7, Ex. A. This internal correspondence shows the internal decisional process that CMS follows when considering the emergency relief waivers for Merit-based Incentive Payment System-eligible clinicians and providers. *Id.* ¶ 7.

Releasing the contents of this internal correspondence would show how CMS makes choices, the criteria CMS uses to determine hardship, how CMS gathers information on the eligible clinicians' need to benefit from an emergency waiver, CMS's inquiry into the justification that is provided to CMS by the eligible clinicians affected by the hurricane, or their representatives, how CMS assesses alternative resolutions to emergency relief, and how CMS assesses compliance with these criteria. *Id.* If any entity dealing with Merit-based Incentive Payment System-eligible clinicians' interests later applies for waivers in communities impacted by hurricanes, such an entity would have a roadmap and would know exactly how to obtain a hurricane emergency waiver, or how to manipulate the information provided to CMS to bypass certain checks and balances regarding the legitimacy of a request for a hurricane waiver. *Id.* With this information, an entity could seek to be exempted from regulatory compliance and use the hurricane emergency waiver as an excuse to obviate this compliance, leading to abuse. *Id.*

Further, under the under the Public Health Service Act the Secretary has the authority to declare a public health emergency to support CMS entities. *See* 2d Gilmore Decl. ¶ 6. The public health emergency authority provided under the Public Health Service Act is exceptional and waiver should be routed via the CMS Administrator and his or her designees. *Id.* ¶ 10. This internal coordination of external requests for emergency waivers routed through the Secretary or through his designee, the CMS Administrator, is important in the context of a natural disaster where it is not business as usual. *Id.* ¶ 11. If this approval process is bypassed or subverted, any entity who is in possession of the identities of the CMS staff involved in the exceptional waiver process could use these names as an indirect lobbying mechanism to exercise pressure on this staff to obtain a waiver within the context of hurricane relief. *Id.* ¶¶ 11-12.

Regarding the sub-regulatory guidance about clarifying the electronic funds transfer processing, if released the public would be able to see old versions of the guidance, compare them with the new versions, and see two different language definitions. *See* 2d Gilmore Decl. ¶ 14. The foreseeable harm is that access to the comments and redlines exposes the identities of CMS staff who are making the edits, and how each CMS employee feels about a certain position that CMS is taking. *Id*. With this information, an entity would then be in a position to identify a CMS employee whose perspective is closely aligned and who could be their champion inside CMS to achieve what they would like to see happen in a CMS policy. *Id*. Also, an entity could use the deliberative information to claim that there was an internal stifling of opinion to change certain procedures, supporting a contention that given the internal dispute, the original language was better. *Id*. ¶¶ 15-16. Further, releasing information related to the changes in the language in the drafts would enable speculation, conjecture, or misinterpretation of why the wording was changed. *Id*. ¶ 17.

Accordingly, the descriptions and rationale set out in the Gilmore Declarations sufficiently establish that CMS properly withheld information protected by the deliberative process privilege. This Court should uphold Defendant's withholding pursuant Exemption.

### IV.   CMS PROPERLY INVOKED EXEMPTION 6.

Plaintiff asserts that CMS did not properly apply Exemption 6 to records of complaints in the Testing Tool provided by business submitters. Pl.'s Mot. 17-18.[1] Exemption 6 was applied to the records located in the Testing Tool system—a Privacy Act System of records. *See* Gilmore Decl. ¶ 81. In each instance where information was withheld pursuant to Exemption 6 of the FOIA, CMS determined that the individual's privacy interest was not outweighed by the public

---

[1] Plaintiff does not challenge the application of Exemption 6 to personal email addresses and phone numbers and signatures. Pl.'s Mot. 17.

interest in disclosure of that information. *Id.* CMS reasoned that to disclose this information to anyone other than the complainant would constitute an unwarranted invasion of privacy and violate the business confidentiality of the business submitter, who is the respondent to the complainant. *Id.* The business respondent does not publish complaints that were filed with CMS against it in the Testing Tool system. *Id.*

## CONCLUSION

Accordingly, for the reasons set forth below, and in the Defendant's Memorandum of Law in Support of its Motion for Summary Judgment, because Defendants fully satisfied their FOIA obligations, the Court should grant its motion for summary judgment in their favor and deny Plaintiff's cross-motion.

Dated: April 21, 2023                                             Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

BRIAN HUDAK
Chief, Civil Division

By:     */s/ T. Anthony Quinn*
T. ANTHONY QUINN
Assistant United States Attorney
D.C. Bar No. 415213
United States Attorney's Office
Civil Division
601 D Street, NW
Washington, D.C. 20530
(202) 252-7558
Tony.Quinn2@usdoj.gov

*Counsel for the United States of America*